[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a marital dissolution action commenced by the plaintiff, Frederick G. Wasilausky, Jr., against the defendant, Janina Wasilausky, by complaint dated September 14, 1994. Over a period of several days, the court conducted a hearing on the parties' respective claims. Based on the evidence adduced at trial, the court makes the following findings and orders.
Mr. and Mrs. Wasilausky were married on October 20, 1979 in Hartford, Connecticut. Each has lived in Connecticut for more than one year prior to the commencement of this action. The parties have two children, Valerie, who was born on March 12, 1981, and Michael, who was born on August 31, 1983. No other children have been born to the defendant since the date of the marriage.
While the parties dispute the cause of their marriage's undoing, they agree that it should be dissolved. The court finds that the marriage has irretrievably broken down.
Neither Party is now or has been a recipient of State or municipal public assistance.
Mr. Wasilausky is forty two years old. Mrs. Wasilausky is forty one. Each enjoys good health. The plaintiff, who has a Bachelor of Science Degree, is employed at Connecticut Natural Gas at an annual base salary of approximately fifty seven thousand eight hundred ($57,800) dollars. Additionally, the plaintiff has enjoyed overtime in the past. While his tax return for 1996 has not been completed, Mr. Wasilausky acknowledged that his gross taxable income for 1996 was between sixty four and sixty five thousand ($64,000-$65,000) dollars. This comports with his tax return for 1995 which indicates gross taxable compensation from Connecticut Gas in the amount of sixty four thousand four hundred fifty three ($64,453) dollars. The plaintiff testified credibly, however, that in the latter part of 1996 he was reassigned to a new position which does not feature the possibility of overtime.
In addition to his base salary, Mr. Wasilausky participates in 401k program, and he is vested in a defined benefit pension. With respect to the 401k, the plaintiff's contribution of 3% of his compensation to the plan is matched equally by the company. portion is taxed, and neither portion is included in the plaintiff's gross taxable income. The plaintiff is fully vested CT Page 3466 in this defined contribution plan which has a present account balance of approximately fifty three thousand two hundred thirty ($53,230) dollars. With respect to the pension plan, Mr. Wasilausky, who commenced his employment with the company in 1986, is presently entitled to receive a monthly pension in the amount eight hundred seven ($857) dollars commencing once he attains the normal retirement age of sixty five. This calculation takes into consideration that the plaintiff has designated the defendant as the survivor beneficiary of his plan.
In addition to these company-related retirement plans, the plaintiff owns an I.R.A. with an approximate balance of three thousand nine hundred ($3900) dollars. All of the plaintiff's retirement benefits have been earned during the course of the marriage.
The plaintiff also operates a hobby business known as Rick's Cycle Machinery. He testified credibly that the annual proceeds of approximately two thousand ($2000) dollars from this activity are utilized, in the main, to pay for Michael's racing activities. It's assets appear to consist of machinery and inventory, which the plaintiff has valued at approximately thirty five hundred ($3500) dollars.
The defendant held outside employment before and during the marriage until Valerie was born. Once Michael was a year old, she undertook part time employment, resuming full time employment in 1990. At present, Mrs. Wasilausky is a licensed insurance broker employed by the Allstate. Though there was some dispute between the parties as to whether the defendant is presently entitled to market insurance for companies other than Allstate, the court finds credible the defendant's testimony that while the status of being a broker may entitle her, in principal, to market other insurance lines, she is limited by contract to selling Allstate insurance except for assigned risk insurance. Mrs. Wasilausky presently has gross weekly earnings of eight hundred sixty four ($864) dollars, or forty four thousand nine hundred ($44,900) dollars on an annualized basis.
While her earnings are based on commissions, the defendant testified that her business is growing, albeit gradually. Tax returns introduced during the hearing support this conclusion. Mrs. Wasilausky's W-2 earnings have steadily increased from twenty two thousand seven hundred eighty two ($22,782) dollars in 1991 to her present level of earnings. In addition to her taxable CT Page 3467 compensation, the defendant receives expense reimbursement from the Allstate. In 1996 she received approximately eleven thousand one hundred eighty seven ($11,187) dollars in this regard. The defendant points out, however, and the court accepts as credible, that her actual business expenses exceed the amount of reimbursement she receives from the Allstate. Thus, in 1996, the defendant had actual business expenses of eighteen thousand two hundred forty three ($18,243) dollars, excluding vehicle expense, or approximately seven thousand ($7000) dollars greater than her reimbursements.
In addition to her compensation by commissions, the defendant participates in a profit sharing plan and an agents pension plan through the Allstate. The profit sharing plan has a present account balance of fourteen thousand eight hundred fifty five ($14,855) dollars. With respect to the pension plan, the court finds that Mrs. Wasilausky has the present right to receive a pension from the Allstate in the amount of three hundred seventy eight ($378) dollars a month commencing at age sixty five.
The parties separated in January of 1995 when the defendant and the two children moved from the family residence. While the parties disagree concerning the cause of their separation, it is evident that by January 1, 1995, the marriage was, for all practical purposes, over. The defendant testified credibly that early in the marriage the plaintiff had been physically abusive to her. She also indicated that throughout the marriage the plaintiff had been overly critical of her. She indicated that she remained in the marriage for the children's sake because she felt they should have a father in their home. The plaintiff, on the other hand, claimed that his wife became enamored of another man during the summer of 1994, an alliance he believes contributed to the failure of the relationship. While the defendant denies that she had become romantically involved with this person in 1994, and claims that the time they shared together was in friendship only, she acknowledges that since January, 1996 she and this man have shared a home. Both parties agree that for the past several years they have had frequent arguments, more recently centered around the plaintiff's weekend snowmobiling excursions, and the parties' differing views of the appropriateness of Michael's car racing activities.
With respect to the allocation of causation, it is the court's view that each of the parties must share an equal amount of responsibility for the failure of their marriage, and its CT Page 3468 ultimate dissolution.
Since December of 1995, Michael has resided with his father in the parties' marital residence located on Ripley Hill Road in Coventry. Valerie, who has continuously lived with her mother since the parties' separation in January, 1995, is presently residing with her mother, her mother's male friend, and his daughter, in a home owned by him and located on Nathan Hale Road in Coventry. The parties agree that they should share joint custody of the children, that Michael's primary residence should be with the plaintiff, Valerie's with the defendant, and that each party should have reasonable rights of access to the child living with the other.
The parties' disputes concern the level of child support, alimony, the distribution of assets, and a claim by the defendant that the plaintiff is in contempt of pendente lite orders concerning child support.
With respect to the level of child support, the court finds from the parties' respective financial affidavits that the defendant has weekly net disposable income of five hundred thirty five ($535) dollars, the plaintiff has weekly net disposable income of seven hundred thirty three ($733) dollars, and that by application of the child support guidelines, the plaintiff should pay weekly support to the defendant in the amount of forty ($40) dollars. In addition, the plaintiff presently carries both children and the defendant on his employment-related health insurance. While the plaintiff should continue to maintain the children on his health insurance, the defendant will not be eligible for such coverage after the marital dissolution because of the availability of insurance to her through the Allstate.
The defendant seeks alimony. In a marital dissolution action, neither party has an absolute right to alimony. The Supreme Court has stated, "The primary basis for an award of alimony has been not to punish a guilty spouse but to continue the duty to support the other who, in legal contemplation, was abandoned. Tobey v.Tobey, 165 Conn. 742, 748, 345 A.2d 21 (1974). In awarding alimony, the court exercises its sound discretion, taking into consideration the circumstances of the case such as the estate of the parties, their incomes, ages, considerations of health, stations in life, and earning capacities. (internal citations omitted)." Fattibene v. Fattibene, 183 Conn. 433 (1981). As noted in Fattibene, the criteria for alimony have been codified in CT Page 3469 Connecticut General Statutes § 46b-82. In reviewing those statutory criteria in light of the credible evidence adduced at the hearing, the court concludes that no award of alimony is warranted in this case. In coming to this conclusion, while the court has considered all the appropriate statutory criteria, the court notes specifically that the defendant is well educated, in good health, and successfully employed in a professional position from which she derives substantial earnings.
A major source of disagreement between the parties centers around the family residence. The parties' first home was purchased in 1981, approximately two years after their marriage, for seventy two thousand ($72,000) dollars. This home was a single family residence situated on approximately seven and one half acres. The plaintiff had started a motor cycle repair business shortly before the marriage which he then sold, realizing approximately sixteen thousand ($16,000) dollars. This amount with interest, and a loan of twenty four thousand ($24,000) dollars from the plaintiff's father were utilized as a down payment, with the balance of approximately thirty thousand ($30,000) dollars financed by the seller. In 1987 the parties subdivided their acreage, and sold the home with three acres for one hundred twenty eight thousand five hundred ($128,500) dollars. On the remaining four acres which they retained, the parties constructed a house and barn at a total cost of one hundred forty five thousand ($145,000) dollars.
The parties deferred the capital gains taxes due on the sale of their first house. When they owned this residence, they had improvement costs including closing costs, with the result that at the time of the sale, the parties had a total capital gain of sixty six thousand three hundred sixty ($66,360) dollars. Pursuant to advise from their accountant, the parties allocated fifty eight thousand eight hundred ($58,800) dollars of this gain to the purchase price of the home and acres they sold, and they allocated thirteen thousand two hundred dollars to the four acres they retained. As a consequence, the parties' tax basis in their present home is calculated by adding to the construction costs of one hundred forty five thousand ($145,000) dollars, the sum of thirteen thousand two hundred ($13,200) dollars as land value, and subtracting from the gross sum of one hundred fifty eight thousand ($158,000), the carry-forward gain amount of sixty six thousand three hundred sixty ($66,360) dollars. By this calculation, the parties' tax basis in their home is ninety one thousand, eight hundred forty ($91,840) dollars. CT Page 3470
The plaintiff has asked the court to take the likely capital gains tax on the sale of this residence into consideration in determining the division of assets. While the court may take the tax consequences of its orders into consideration in fashioning its orders, it is not required to do so. Damon v. Damon,23 Conn. App. 111 (1990); Powers v. Powers (11), 186 Conn. 8 (1982).
Whether the court should consider the potential tax consequences of a sale of the residence is not the only focus of the parties' disagreement concerning the residence. At the time of the parties' separation in January 1995, the mortgage balance on the property was approximately eighty thousand ($80,000) dollars. It is presently approximately sixty five thousand ($65,000) dollars. Since the parties' separation, the defendant has made no payments directly or indirectly on the mortgage. The plaintiff alone has made the monthly mortgage payments of approximately nine hundred eighty six ($986) dollars. The plaintiff believes, therefore, that since he has made the payments without contribution from the defendant during the more than two years since their separation, he alone should benefit from the simultaneous reduction of the mortgage principal. The court is unpersuaded. In presenting his argument, the plaintiff has not given regard to the fact that he has enjoyed the use and occupancy of the residence during the relevant time period; nor did he introduce any probative evidence that the monthly amount of the mortgage payment exceeded the fair market rental of the property.
The parties' final dispute concerning the residence relates to its fair market value. It has been appraised on numerous occasions by various appraisers. The plaintiff presented an appraisal done by Joseph Calvo on February 14, 1997 which posits a fair market value of two hundred twenty thousand ($220,000) dollars. During the trial, Mr. Calvo acknowledged that he had appraised the property in December of 1994 for the same amount. In response to questioning, he claimed that property values have remained stable in the past few years, and that his current valuation is substantiated by the comparables he utilized. The plaintiff also introduced an appraisal, dated December 7, 1993, from Cynthia Kendall, positing a value of one hundred ninety nine thousand ($199,000) dollars.
The defendant, on the other hand, produced an appraisal report from Deborah Gignac, dated November 9, 1994, indicating a CT Page 3471 value of two hundred sixty five thousand ($265,000) dollars, and another, from Robert Stewart, positing a value of two hundred forty thousand ($240,000) dollars as of June 22, 1995.
In assessing this valuation evidence, the court has no extraordinary means of divination. The court rejects the 1993 and 1994 appraisals as too dated in time for present reliability. The court also notes that the appraisal conducted by Deborah Gignac utilized, as comparable sales, two out of three properties not situated in Coventry, while both Mr. Stewart and Mr. Calvo's appraisals considered comparable sales exclusively in Coventry. The court finds that both the Calvo and Stewart appraisals are reliable, and that the differences between them flow from subjective valuation opinions inherent in appraisal practice, and that neither appraisal contains any factual error sufficient to make its conclusion unreliable. The court finds the fair market value of the property, as of this date, to be two hundred thirty thousand ($230,000) dollars. Based on this finding, the gross equity in the property, without regard to closing costs, realtor fees, and taxes, is approximately one hundred sixty five thousand ($165,000) dollars. If it were sold, a reasonable realtor fee of six percent would further reduce its equity to one hundred fifty one thousand two hundred ($151,200) dollars.
In determining the disposition of the residence the court is mindful not only of the criteria for distribution of property as recited in C.G.S. § 46b-81, but also of the fact that the home is presently the primary residence of one of the parties and their minor son Michael, who is thirteen years of age. The court is also aware, from the testimony of both parties, that each made substantial physical contributions toward the construction of the house. Accordingly, the court believes it appropriate that the plaintiff should be entitled to exclusive possession of the marital home while Michael is in his primary care up to September 1, 2001, or until September 1, 2002 in the event that Michael does not complete high school in 2001. The court also finds, however, that the plaintiff should not be required to remain in the house, and that there should be some provision made to entitle the plaintiff to cause the real estate to be sold with the defendant to receive an appropriate share of the proceeds. Finally, in light of the plaintiff's present occupancy of the home and the defendant's alternative housing arrangements, the court finds that the plaintiff should be entitled, at his election, to purchase the defendant's interest from her, giving due regard to her entitlement to a fair distribution from this CT Page 3472 asset. It is implicit in these findings that the court believes the defendant should receive a fair share of the proceeds from the ultimate sale of the residence.
At the time of the parties' separation, the defendant removed a substantial amount of personal property from the family residence. She also left surreptitiously, with the result that the plaintiff returned home to find not only his wife and children, but many of the household furnishings missing. However sudden and unilateral the defendant's exit, the house was not left bereft of contents. With few exceptions, the court is satisfied that each party should retain possession of the items each presently has. However, when the defendant left, she removed window treatments made specially for the windows in the family residence, and they are not being used by the defendant. These window treatments should be returned immediately by the defendant to the plaintiff in good condition. Similarly, the defendant removed a snowmobile which had been utilized by Michael, and which the defendant has not ridden for a substantial period of time. This, too, should be immediately returned. More troubling is the piano, given to the plaintiff by his parents, and removed by the defendant. Evidence adduced at the hearing suggests that Valerie enjoys use of this piano which is currently kept at the defendant's parents' home. There is, however, no reason Valerie can not play the piano at her father's home. While the court affirms that the piano is the property of the plaintiff, it is the court's expectation that the plaintiff and Valerie will work out a suitable arrangement so that Valerie might have the enjoyment of this instrument, whether at her maternal grandparent's home, at her own home, on in her father's residence. While the court awards ownership of the piano to the plaintiff, its location shall be left for father and daughter to determine.
In regard to personal property, the court is mindful that the defendant removed a Toyota Camry, the value of which the plaintiff wishes the court to take into consideration in the court's allocation of assets. Finally, with respect to personal property, the parties have stipulated that the defendant will return a rocking chair and a five year CNG clock to the plaintiff and that the plaintiff will return the defendant's cookbooks and her Allstate ring to her. This stipulation is approved by the court.
With respect to liabilities, the defendant acknowledged that CT Page 3473 she has incurred approximately twenty four thousand ($24,000) dollars in debt since separating from the plaintiff. During her testimony, she pointed to no liabilities on her financial affidavit incurred for family purposes while the parties lived together. The plaintiff also shows substantial liabilities on his affidavit, and the plaintiff paid certain liabilities through the sale of certain stocks during the parties' separation. With respect to the taxes due to the Town of Coventry, the plaintiff testified that he has paid sixty percent of the taxes accruing since the defendant left the premises with the expectation that she should be required to pay the balance. It is the court's view that each party should be responsible for liabilities he or she has incurred, but that the plaintiff should be solely responsible for the past due and future real estate taxes so long as he exclusively occupies the home.
Finally, the defendant claims that the plaintiff is in contempt of court for his failure to pay child support in accordance with the pendente lite orders of the court. A review of the court's file reveals that on January 17, 1995 the parties agreed and the court ordered that the plaintiff should pay the sum of one hundred ninety ($190) dollars as weekly child support. On December 6, 1995, the defendant filed a motion for contempt, alleging that the plaintiff had not complied with certain court orders, including its pendente lite child support order. Subsequently, by motion dated February 27, 1996, the plaintiff moved to modify child support. It does not appear from the court file that any action was taken by the court on either of these motions. The defendant has reclaimed her motion for contempt and now wishes the court to find the plaintiff in contempt for his failure to comply with the court's child support order. During the hearing, the defendant testified that once Michael left her residence to live with his father, the plaintiff began to pay her ninety five ($95) dollars a week for a short period of time, and then he paid her the sum of fifty ($50) dollars a week until shortly before the commencement of this hearing when he further reduced his payments to twenty five ($25) dollars a week. The plaintiff testified that while he knew that the court order of one hundred ninety ($190) dollars a week had never been modified, he decided to pay the plaintiff the sum of fifty five ($55) dollars a week based on his understanding of a recommendation made by a family relations counselor. On this evidence, the court is able to determine that the plaintiff is not, in fact, in contempt of court, for it appears that his lower level of payments were based on an understanding that his obligation was CT Page 3474 less once Michael was residing with him. This does not resolve the question, however, of whether there remains an arrearage on the court order. The court is mindful, also, that the plaintiff filed a motion to modify upon which no action has been taken but which the court in the exercise of its discretion could grant retroactive to the date of filing. Since the court has an insufficient basis on which to determine the amount of the arrearage and what, if any, action it would take on the plaintiff's pending motion to modify, the parties should be entitled to a further evidentiary hearing on their respective motions. However, in order to obviate the need for such a hearing, without actually determining the issues, the court offers as guidance to the parties that in viewing the plaintiff's motion to modify the court would review the parties' incomes during 1996, including overtime, to determine an appropriate level of child support the plaintiff should be ordered to pay. In making this determination, the court would not include the amounts contributed toward the parties' defined contribution retirement programs, since these amounts have been taken into consideration by the court in formulating its judgment orders herein. In the event such a calculation results in the plaintiff owing further child support to the defendant for the time period involved, the amount in its entirety should be paid within a period of thirty days.
Having considered all the evidence and in light of the statutory criteria set forth in Chapter 815j, with particular regard to C.G.S. §§ 46b-56, 46b-62, 46b-81, 46b-82, 46b-86, and 46b-87, the court enters the following orders:
The marriage is dissolved on the basis that it has broken down irretrievably.
The parties shall share joint custody of their minor children. The primary residence of Michael shall be with his father, and the primary residence of Valerie shall be with her mother. Each parent shall have reasonable rights of access to the child living with the other parent. The parties shall consult with one another concerning any major decisions relating to the childrens' education, health, and moral upbringing.
Recognizing that the plaintiff is the custodian of certain Uniform Gift to Minor's Act accounts on behalf of each child, and mindful that the plaintiff's duties and liabilities are CT Page 3475 prescribed by statute, the court directs the plaintiff to provide an accounting to the defendant on a quarterly basis of the status of each child's account so long as such account is in existence. Such report shall be in writing and shall include a statement of the account value, it's investment inventory, and a history of transactions, additions, and/or withdrawals within the prior quarter. While the first such report shall be due on July 1, 1997, the plaintiff shall provide an accounting of such accounts, with the information noted supra within thirty days of this Memorandum. In addition, the plaintiff shall furnish the defendant will all documentation required by the defendant to assist Valerie to prepare and file her Federal and State tax returns within ten days from the filing of this Memorandum.
The plaintiff is ordered to pay to the defendant, as child support for Valerie, the sum of forty ($40) dollars weekly by contingent wage withholding.
The plaintiff is ordered to maintain both children as dependents on his existing health care insurance for so long as they are eligible and he may be legally required to do so in accordance with the dictates of Connecticut statutes. In addition, the parties are to share equally the cost of any health care incurred on behalf of either minor child either not covered by insurance or below the threshold amount for insurance coverage. Before either parent incurs any such cost, the parent intending to incur such cost shall consult with the other parent in regard to ! the health care necessity of such treatment. The provisions of C.G.S. § 46b-84 shall apply in regard to reimbursement from any insurer.
No alimony is awarded to either party.
Each party shall be entitled to retain ownership of the personal property each possesses with the exceptions specifically noted in the body of this Memorandum. This order includes the motor vehicles presently possessed by the parties.
The plaintiff shall execute a Qualified Domestic Relations Order to provide that the defendant shall remain the survivor beneficiary of his Connecticut Gas Company pension plan and to provide that the defendant shall be paid the sum of two hundred forty ($240) dollars a month from such plan commencing on the month that the plaintiff becomes sixty five (65) or sooner retires. The plaintiff shall have no interest in the defendant's CT Page 3476 pension plan.
The plaintiff shall transfer, from his 401k plan, the sum of nineteen thousand, one hundred eighty seven ($19,187) dollars to an I.R.A. account to be designated by the defendant. In the event such a transfer can not be made for reasons not apparent to the court, the plaintiff shall, as an alternative, execute a QDRO directing the 401k plan administrator to sever the sum of nineteen thousand, hundred eighty seven ($19,187) dollars from the plaintiff's 401k plan and to deposit it into a similarly tax-deferred retirement account in the name of and on behalf of the defendant.
The plaintiff shall have exclusive possession of the marital residence so long as Michael is in his primary care up to September 1st of the year in which Michael graduates from high school, or until September 1, 2002 in the event that Michael does not graduate from high school in 2001. During such period of exclusive occupancy, the plaintiff shall be solely responsible for payment of the mortgage principal and interest, home owners insurance, and real estate taxes, together with all other costs associated with ownership, use, and occupancy, or the residence. The plaintiff shall have the affirmative obligation to maintain a policy of homeowners insurance adequate to protect the fair market value of the property from fire loss. No less than four months prior to the date on which the plaintiff's right to exclusive occupancy terminates, the property shall be placed on the real estate market at a listing price to be agreed upon by the parties, and sold to a bona fide purchaser in an arms length transaction for an amount agreed upon by the parties. In the event the parties are not able to agree upon a listing price, either party may apply to the court for the designation of an appraiser who shall be selected by the court to determine the fair market value of the property, and to recommend a listing price for the property. The parties shall accept, at the option of either party, an offer to purchase the property at a price equal to ninety percent or better of the price. Upon sale, the net proceeds, defined as gross sales price, less mortgage balance, taxes, real estate agent's fees, and closing costs, shall be divided equally between the parties.
The plaintiff, however, should not be required to remain in the residence. Therefore, in addition to the provisions for sale of the property already noted, and at the sole election of the plaintiff, the property may be placed on the market and sold CT Page 3477 pursuant to the terms recited by the court supra at any time between the date of this Memorandum and the date on which the plaintiff is required to list the property for sale, and the defendant shall cooperate in this regard. The net proceeds shall be divided as hereinbefore noted.
The plaintiff shall also be entitled to purchase the defendant's interest in the real property. In order to effectuate this entitlement, the defendant is ordered to execute a quit claim to the property in favor of the plaintiff at any time between the date of this Memorandum and September 1, 2001, upon payment by the plaintiff of the sum of seventy five thousand, six hundred ($75,600) dollars to the defendant. In addition, should this payment be made at a date subsequent to February 28, 1998, the plaintiff shall pay the defendant, as an additional amount, interest in the amount of five percent of seventy five thousand six hundred ($75,600) dollars. This interest payment should be calculated on an annual basis commencing March 1, 1998 and pro rated to the date of closing. The intention of the provision is to permit the plaintiff to purchase the defendant's interest for the total sum of seventy five thousand six hundred ($75,600) dollars at any time between the date of this Memorandum and February 28, 1998, but that if the purchase takes place subsequent to that date, the plaintiff should pay interest to the defendant in the amount of five percent with interest accruing from March 1, 1998.
During the period of the plaintiff's exclusive occupancy, the parties should be jointly liable for the payment of any extraordinary repair and maintenance costs, which are defined by the court as any single cost occurrence which exceeds two hundred and fifty ($250) dollars. In the event of any such extraordinary repair or maintenance requirement, the plaintiff shall provide the defendant with appropriate invoices within thirty days of their incurrence and the defendant shall reimburse the plaintiff one half the total cost for such extraordinary repair or maintenance within thirty days of her receipt of the invoices.
During the period that the property remains in joint names neither party shall cause any liens or attachments to be placed on the property, nor shall either party utilize the property as security for any indebtedness without the express written approval of the other. Subsequent to the date of judgment in this matter, the parties shall share ownership of the property as tenants in common. CT Page 3478
Each party shall be responsible for the payment of the liabilities each has incurred, except that the plaintiff shall be soley responsible for the payment of the past due real estate taxes on the parties' real property. With the exception of the orders made herein, each party shall be entitled to the ownership of the assets each currently possesses.
Each party shall be responsible for the payment of his and her counsel fees. The parties shall share equally any unpaid portion of Attorney Florintino's fees, unless such payment is contrary to any previous court order.
The court shall retain jurisdiction over this matter in order to effectuate the terms of its property division, including the provisions related to the plaintiff's retirement plans, and the sale of the marital residence.
Unless stated to the contrary, all transfers of property and execution of documents necessary to effectuate the orders made herein shall take place within thirty days of this Memorandum.
Judgment may enter accordingly.
Bishop J.